# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Delenator Stevens, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>Walgreen Co.,<br><br>Defendant. | CASE NO.  21-cv-10603<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Delenator Stevens ("Plaintiff") brings this action on behalf of himself and all others similarly situated against Defendant Walgreen Co. ("Defendant"). Plaintiff makes the following allegations pursuant to the investigation of his counsel and based upon information and belief, except as to the allegations specifically pertaining to himself, which are based on personal knowledge.

## INTRODUCTION

1.      This is a putative class action lawsuit on behalf of purchasers of Defendant's lidocaine patches (the "Lidocaine Patches").[1] Defendant markets, sells and distributes the Lidocaine Patches through numerous brick-and-mortar Walgreens retail locations and online through www.walgreens.com.

---

[1] The Lidocaine Patches include Defendant's "Pain Relieving Lidocaine Patch (5 patches)"; "Pain Relieving Lidocaine Patch (6 patches)"; "Pain Relieving Lidocaine Patches"; and "Cool n' Heat Lidocaine Patch."

2.      Lidocaine is a topical anesthetic that is used to treat pain by blocking the transmission of pain signals from nerve endings in the skin to the spinal cord and brain. Specifically, lidocaine functions by blocking sodium channels located on nerve endings which prevents action potential from propagating in the nerve cell and thereby interrupting the transmission of the pain signal.

3.      Although lidocaine patches are often prescribed by doctors, Defendant offers its Lidocaine Patches over-the-counter to unsuspecting consumers under false pretenses. Defendant takes advantage of these consumers by prominently displaying on the packaging of the Lidocaine Patches that the patches deliver a "Maximum Strength" dose of lidocaine while "Staying-put" for "up to 12 hours." Plaintiff and the proposed class members relied on those representations when making their purchases. To their dismay, however, Defendant's Lidocaine Patches regularly peel off their bodies within a few hours, and oftentimes minutes, after being properly applied, and do not deliver a maximum amount of lidocaine available in patch form.

4.      As a result of its deceptive conduct, Defendant is, and continues to be, unjustly enriched at the expense of its customers.

## JURISDICTION AND VENUE

5.      This Court has original jurisdiction over the claims asserted herein individually and on behalf of the class pursuant to 28 U.S.C. § 1332, as amended by the Class Action Fairness Act of 2005. Subject matter jurisdiction is proper because: (1) the amount in controversy in this class action exceeds five million dollars, exclusive of interest and costs; (2) there are more than 100 Class members; (3) at least one member of the Class is diverse from the Defendant; and (4) the Defendant is not a governmental entity.

6.     This Court has personal jurisdiction over Defendant because it conducts substantial business within New York, including the sale, marketing, and advertising of the Lidocaine Patches. Furthermore, a substantial portion of the events giving rise to Plaintiff's claims occurred in this State, including Plaintiff's purchases.

7.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Defendant does substantial business in this District and a substantial part of the events giving rise to Plaintiff's claims took place within this District.

## THE PARTIES

8.     Plaintiff Delenator Stevens is a citizen of New York, residing in New York, New York. Plaintiff Stevens purchased Defendant's "Pain Relieving Lidocaine Patch (5 patches)" for approximately $8.99; "Pain Relieving Lidocaine Patch (6 patches)" for approximately $11.49; "Pain Relieving Lidocaine Patches" for approximately $12.49; and "Cool n' Heat Lidocaine Patch" for approximately $9.49. Plaintiff Stevens purchased these Lidocaine Patches on various occasions within the applicable statute of limitations, with his most recent purchase taking place in July of 2021. Plaintiff Stevens made these purchases at Walgreens stores located in the Bronx and New York, New York. Prior to his purchases, Plaintiff Stevens saw that the Lidocaine Patches were labeled and marketed as "Maximum Strength" and "Stay-put flexible" and read the directions on the back label, which indicated that he could use "[o]ne patch for up to 12 hours." Plaintiff Stevens relied on Defendant's representations when he decided to purchase the Lidocaine Patches over comparable and less expensive pain-relieving patches or gels. Plaintiff Stevens saw those representations prior to and at the time of his purchases and understood them as a representation and warranty that the Lidocaine Patches would reliably adhere to his body and deliver a 4% lidocaine dose for 12 hours. Initially, Plaintiff Stevens became frustrated when

his Lidocaine Patches peeled off his body while engaging in regular activities—such as walking, sitting, stretching, and sleeping—well before the represented 12 hours, through no fault of his own. Plaintiff Stevens, nonetheless, continued to purchase other Lidocaine Patches, believing that such failures were the result of one-off manufacturing flukes. After giving the Lidocaine Patches the benefit of the doubt, however, Plaintiff Stevens stopped purchasing them altogether after realizing that the Lidocaine Patches consistently failed to "Stay-put" or deliver a 4% "Maximum Strength" lidocaine dose for "up to 12 hours." For example, on a couple of occasions, the Lidocaine Patches that Plaintiff Stevens bought peeled off his body within an hour or two after he properly applied them pursuant to the directions contained on the products— delivering little to no analgesic effect to his sore muscles. Plaintiff Stevens relied on Defendant's representations and warranties in deciding to purchase his Lidocaine Patches. Accordingly, those representations and warranties were part of the basis of his bargains, in that he would not have purchased his Lidocaine Patches on the same terms had he known those representations and warranties were false. However, Plaintiff Stevens remains interested in purchasing Defendant's Lidocaine Patches and would consider the Lidocaine Patches in the future if Defendant ensured that the products actually "[s]tay- put" and can deliver a 4% "Maximum Strength" dose of lidocaine to his body for "up to 12 hours." Additionally, in making his purchases, Plaintiff Stevens paid a substantial price premium due to Defendant's false and misleading claims regarding the qualities of its Lidocaine Patches. However, Plaintiff Stevens did not receive the benefit of his bargains because his Lidocaine Patches did not, in fact, "[s]tay-put" or deliver a 4% "Maximum Strength" dose of lidocaine to his body for "up to 12 hours."

9.     Defendant Walgreen Co. ("Defendant") is an Illinois corporation with its principal place of business in Deerfield, Illinois. Defendant markets, sells, and distributes the

Lidocaine Patches and is responsible for the advertising, marketing, trade dress, and packaging of the Lidocaine Patches. Defendant marketed, distributed, and sold the Lidocaine Patches during the class period.

## FACTUAL ALLEGATIONS

### *Defendant's False Advertising*

10.     Defendant markets, sells and distributes the Lidocaine Patches through numerous brick-and-mortar Walgreens retail locations and online through www.walgreens.com. On the Lidocaine Patches packaging, Defendant represents that its Lidocaine Patches are "Stay-put flexible" patches that can be applied "up to 12 hours." The Lidocaine Patches are all substantially similar, in that they all share the same adhesiveness misrepresentations:

   

11.     By representing that Lidocaine Patches are "Stay-put flexible" patches that can be applied "up to 12 hours"[2]—a very specific number—Defendant induced Plaintiff and the proposed class members into believing that the Lidocaine Patches: (1) would continuously adhere to their bodies up to 12 hours; (2) were sufficiently flexible to withstand regular activities

---

[2] In the directions panel on the back label of each of the Lidocaine Patches, Defendant represents that consumer can "Use one patch for up to 12 hours." Exhibit A.

(such as walking, stretching, and sleeping) for someone who is suffering from sore muscles; and (3) would continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein. Furthermore, by representing that the "Pain Relieving Lidocaine Patch (6 patches)" and "Pain Relieving Lidocaine Patches" (the "Maximum Strength Lidocaine Patches") provide "Maximum Strength," Defendant induced Plaintiff and the proposed class members into believing that the Maximum Strength Lidocaine Patches: (1) contain and deliver the maximum amount of lidocaine available in patch form; and (2) that they are superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

12.     Despite these representations, however, Defendant's Lidocaine Patches: (1) systematically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

### Defendant's Knowledge of the Defective Lidocaine Patches

13.     Defendant knew that its Lidocaine Patches did not live up to the adhesiveness representations contained therein based on dozens of complaints posted on its own website, www.walgreens.com, which Defendant actively monitors.

14.     For example, in October of 2021, a buyer explained their issue trying to get a Lidocaine Patch to adhere to their body:

"They don't stick to the skin well at all, the edges curl off with every movement, they're in a constant state of falling off. All the edges curl up from the moment you put them in and stick to any clothing or bedding rolling them up and pulling them off."[3]

15.     In January of 2021, yet another consumer expressed their frustration using

Defendant's Lidocaine Patch:

"I bought these thinking they'd be better than they turned out to be. Scent free is about the only positive thing. They don't stick very well and if you have them under your cloths - normal moving around they fall off. Very disappointed but am unable to return them."[4]

16.     Furthermore, Defendant knew, or should have known, that its Lidocaine Patches

were defectively designed based on FDA reports and scientific studies regarding the efficacy of

the products.

17.     Specifically, Defendant's Lidocaine Patches work by delivering lidocaine through

a transdermal mechanism—i.e., by delivering the analgesic chemical "through the dermis, or

skin…in ointment or patch form."[5] According to FDA reports, transdermal drug delivery

systems, such as the one used by Defendant, systematically fail to adhere to the body.[6] To that

end, the FDA is in the process of finalizing an industry guidance on "Transdermal and Topical

---

[3] https://www.walgreens.com/store/c/walgreens-lidocaine-pain-relief-patches/ID=prod6386698-product (last accessed December 10, 2021).

[4] https://www.walgreens.com/store/c/walgreens-lidocaine-patches/ID=300394242-product (last accessed December 10, 2021).

[5] https://medical-dictionary.thefreedictionary.com/transdermal (last accessed December 10, 2021).

[6] *See* Yellela S.R. Krishnaiah *FDA Perspectives on Product Quality of Transdermal Drug Delivery Systems*, PhD Division of Product Quality Research OTR/OPQ/CDER US Food and Drug Administration Silver Spring, MD, USA AAPS 2015  Sunrise Session (2015). https://healthdocbox.com/Deafness/74997073-Fda-perspectives-on-product-quality-of-transdermal-drug-delivery-systems.html (last accessed December 10, 2021).

Delivery Systems" to address, *inter alia*, "considerations for areas where quality is closely tied to product performance and potential safety issues, such as adhesion failure…"[7]

18.     Even more alarming, the FDA Adverse Events Reporting System reports that approximately 70% of concerns stemming from lidocaine patches involve their poor adhesion.[8]

19.     Furthermore, a peer-reviewed study published in January of 2021 by the Journal of Pain Research found that 0% of generic prescription lidocaine patches had a >90% adhesion rate to the study's subjects after 12 hours (i.e., essentially no part of the product lifting off the skin).[9] The study also found that after 12 hours, "37.5% of subjects experienced substantial detachment (to <10% adhesion) while using the generic lidocaine patch 5%, including 7 (29.1%) complete detachments." The study also found that the mean adhesiveness score of the generic lidocaine patches after 12 hours was 37.67% (where 0% reflects complete detachment and 50%

---

[7] *See* 84 FR 64319 - *Transdermal and Topical Delivery Systems-Product Development and Quality Considerations; Draft Guidance for Industry*; Availability (2019) https://www.regulations.gov/document/FDA-2019-D-4447-0001 (last accessed December 10, 2021).

[8] *See* Gudin J, Nalamachu S. *Utility of lidocaine as a topical analgesic and improvements in patch delivery systems*. *Postgrad Med*. 2020;132(1):28–36. doi:10.1080/00325481.2019.1702296 https://www.tandfonline.com/doi/full/10.1080/00325481.2019.1702296 (last accessed December 10, 2021).

[9] See Gudin J, Webster LR, Greuber E, Vought K, Patel K, Kuritzky L. *Open-Label Adhesion Performance Studies of a New Lidocaine Topical System 1.8% versus Lidocaine Patches 5% and Lidocaine Medicated Plaster 5% in Healthy Subjects*. *J Pain Res*. 2021;14:513-526. Published 2021 Feb 23. doi:10.2147/JPR.S287153. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7914064/ (last accessed December 10, 2021). The study measured adhesion of the patches "immediately after application (0 hours) and at 3, 6, 9, and 12 hours (±15 minutes; before product removal) after application. Assessments in Study 1 were performed by a trained scorer using the FDA-recommended 5-point adhesion scale. The FDA scale ranges from 0 to 4, where 0 represents ≥90% of the product adhered (essentially no part of the product lifting off the skin), 1 represents 75% to <90% adhered (only some edges of the product lifting off the skin), 2 represents 50% to <75% adhered (less than half the product lifting off the skin), 3 represents >0% to <50% adhered (more than half the product lifting off the skin but not detached), and 4 represents 0% adhered (complete product detachment). The mean cumulative adhesion score was calculated by summing the scores at 3, 6, 9, and 12 hours and dividing the total by the total number of observations per subject." *Id.*

reflects half the product lifting off the skin but not detached). In contrast, the study found that a newly developed 1.8% lidocaine patch technology, which is bioequivalent to 5% lidocaine patches,[10] maintained a mean adhesion >90% across all time points (0, 3, 6, 9, and 12 h).

20.     Although the study published by the Journal of Pain Research only tested generic prescription lidocaine patches, upon information and belief, Defendant's over-the-counter Lidocaine Patches—which have not undergone the rigorous approval process required by the FDA and use the same outdated and defective adhesion technology as the generic lidocaine patches[11] —fair no better.

21.     Furthermore, while certain companies have innovated their technology based on clinical studies to ensure that their lidocaine patches reliably adhere to a consumer's body,[12] even while exercising,[13] upon information and belief, Defendant has not.

---

[10] Gudin J, Argoff C, Fudin J, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Open-Label, Bioequivalence Study of Lidocaine Topical System 1.8% and Lidocaine Patch 5% in Healthy Subjects*. J Pain Res. 2020 Jun 22;13:1485-1496. doi: 10.2147/JPR.S237934. PMID: 32606914; PMCID: PMC7319520. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7319520/ (last accessed December 10, 2021).

[11] Defendant, whose Lidocaine Patches are manufactured in China, has not been approved by the FDA to market or sell its Lidocaine Patches despite being required to do so. The FDA is currently reviewing a Citizen Petition filed by Scilex Pharmaceuticals Inc. (a manufacturer of FDA-approved lidocaine patches) to remove from the market all over-the-counter lidocaine patches that lack FDA approval. *See* https://www.regulations.gov/docket/FDA-2019-P-0417/document (last accessed December 10, 2021).

[12] https://www.scilexpharma.com/scilex-presents-ztlido-data-on-superior-adhesion-over-lidocaine-patch-formulation/ (last accessed December 10, 2021).

[13] A separate study demonstrated that Scilex's lidocaine patches were able to reliably adhere when subjects engaged in moderate physical exercise (exercise bike) and heat (heating pad). *See* Fudin J, Wegrzyn EL, Greuber E, Vought K, Patel K, Nalamachu S. *A Randomized, Crossover, Pharmacokinetic and Adhesion Performance Study of a Lidocaine Topical System 1.8% During Physical Activity and Heat Treatment in Healthy Subjects*. *J Pain Res*. 2020;13:1359-1367. Published 2020 Jun 10. doi:10.2147/JPR.S238268. https://www.ncbi.nlm.nih.gov/pmc/articles/PMC7293912/#CIT0007 (last accessed December 10, 2021).

22.     In complete disregard of the wealth of information to the contrary, however, Defendant continues to misrepresent that its Lidocaine Patches reliably adhere to its consumers' bodies up to 12 hours when, in fact, they do not. Defendant also failed to inform its consumers that the Lidocaine Patches are prone to even greater detachment when they engage in certain activities (such as walking, stretching, and sleeping). Nor is Defendant's representation that its Lidocaine Patches are capable of continuously relieving pain by providing a 4% lidocaine dose throughout the specified 12 hours true, given that they systematically fail to fully adhere to its consumers' bodies for that period. This is crucial because "[a]dequate adhesion is a critical quality attribute for topical delivery systems; if the product lifts or detaches during wear, dosing may be compromised and there is an increased risk of inadvertent exposure to others."[14]

23.     To make matters worse, Defendant misrepresents, without providing adequate disclaimers, that its Maximum Strength Lidocaine Patches provide a "Maximum Strength" dose of lidocaine, when, in fact, there are superior lidocaine patches in the market that deliver a higher amount of lidocaine: including the previously mentioned 5% and 1.8% prescription-strength lidocaine patches.[15] Defendant compounds this problem by indicating that the Maximum Strength Lidocaine Patches are "Medicated"—thereby reinforcing the misrepresentation that its Maximum Strength Lidocaine Patches are comparable to prescription-strength lidocaine patches.

24.     Furthermore, nothing in Defendant's Maximum Strength Lidocaine Patches indicates that they provide a greater dose of lidocaine in comparison to other over-the-counter lidocaine patches, including its own. Specifically, Defendant's representation that its Lidocaine Patches contain 4% lidocaine is misleading because the actual strength of a lidocaine patch is

[14] *See supra* footnote 10.
[15] *Id*.

measured by the "mass of drug relative to the mass of the adhesive per patch."[16] In other words, Defendant's representation that its Lidocaine Patches contain 4% lidocaine does not indicate the *actual* amount of lidocaine milligrams that its Lidocaine Patches deliver to a consumer's body.[17]

25.    Shockingly, and by way of illustration, Defendant labels its "Pain Relieving Lidocaine Patch (6 patches)" as possessing "Maximum Strength" although it has the exact specifications and delivers the same amount of lidocaine as its non-maximum-strength "Pain Relieving Lidocaine Patch (5 patches)"—both Patches weigh 9 grams per patch and contain a lidocaine dose of 4 grams for every 100 grams.[18] Translated into milligrams, both Patches contain 360 milligrams of lidocaine per patch—although one of the Patches claims to possess "Maximum Strength," while the other one does not. Further, both of Defendant's Maximum Strength Lidocaine Patches contain less lidocaine than other over-the-counter lidocaine patches: which range from 411.4 to 4,500 milligrams.[19] Defendant's arbitrary and patently false claim regarding the strength of its Maximum Strength Lidocaine Patches goes beyond the pale.

26.    Had Defendant not made the false, misleading, and deceptive misrepresentations and omissions alleged herein, Plaintiff and the proposed class members would not have

---

[16] *See* Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit B at pg. 19.

[17] "It is emphasized that most of these patch products are labeled as a percentage strength, without providing the total drug content per patch. For other topical dosage forms like creams, ointments, and lotions, the amount of drug administered can easily be determined by weighing the mass of product and applying the strength factor as illustrated in the table below. In contrast, the amount of drug applied for patch products cannot easily be determined because the exact mass of adhesive applied cannot be estimated due to the contributing mass of the backing materials. inasmuch as patches are manufactured in a variety of sizes and thicknesses, the drug exposure from patches is unknown and cannot be estimated by reviewing the product label, unless the manufacturer discloses the drug mass. Many of the patch products exclude this from their labels, and the absence of this information on unapproved OTC product labels creates a safety risk." Ex. B at pg. 20.

[18] https://www.dailymed.nlm.nih.gov/dailymed/drugInfo.cfm?setid=1a587e6e-88d1-4b01-abad-9a365dc64a4d (last accessed December 10, 2021).

[19] *See* Attachment 1 to Scilex Pharmaceuticals Inc.'s Citizen Petition. Exhibit C.

purchased the Lidocaine Patches or would not have paid as much as they did for those purchases. Thus, Plaintiff and the proposed class members suffered an injury in fact and lost money or property as a result of Defendant's wrongful conduct.

## CLASS ACTION ALLEGATIONS

27.     Plaintiff brings this action on behalf of himself and all other similarly situated persons pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3).

28.     The class periods shall be defined from the date of the filing of this Complaint, back to any such time the Court deems appropriate.

29.     Plaintiff seeks to represent all persons in the United States who purchased Defendant's Lidocaine Patches (the "Class").

30.     Plaintiff also seeks to represent a subclass of all Class members who purchased Defendant's Lidocaine Patches in New York (the "New York Subclass") (collectively with the Class, the "Classes").

31.     The Classes do not include (1) Defendant, its officers, and/or its directors; or (2) the Judge to whom this case is assigned and the Judge's staff.

32.     Plaintiff reserves the right to amend the above class definitions and add additional classes and subclasses as appropriate based on investigation, discovery, and the specific theories of liability.

33.     ***Community of Interest***: There is a well-defined community of interest among members of the Classes, and the disposition of the claims of these members of the Classes in a single action will provide substantial benefits to all parties and to the Court.

34.    ***Numerosity***: While the exact number of members of the Classes is unknown to Plaintiff at this time and can only be determined by appropriate discovery, upon information and belief, members of the Classes number in the millions. The precise number of the members of the Classes and their identities are unknown to Plaintiff at this time but may be determined through discovery. Members of the Classes may be notified of the pendency of this action by mail and/or publication through the distribution records of Defendant and third-party retailers and vendors.

35.    ***Existence and predominance of common questions of law and fact***: Common questions of law and fact exist as to all members of the Classes and predominate over any questions affecting only individuals of the Classes. These common legal and factual questions include, but are not limited to:

(a)  Whether the Lidocaine Patches are defective;

(b)  Whether Defendant knew of the Lidocaine Patches' defective nature;

(c)  Whether Defendant breached the express warranties on the Lidocaine Patches' packaging;

(d)  Whether Defendant breached the Lidocaine Patches' implied warranty of merchantability;

(e)  Whether Defendant breached the Lidocaine Patches' implied warranty of fitness for use;

(f)  Whether Defendant's representations that the Lidocaine Patches are "Stay-put flexible" patches that can be applied "up to 12 hours" or otherwise provide "Maximum Strength" are false and misleading in violation of New York's consumer-protection statutes;

(g) Whether Plaintiff and the members of the Classes have suffered damages as a result of Defendant's actions and the amount thereof;

(h) Whether Plaintiff and the members of the Classes are entitled to statutory damages;

(i) Whether Plaintiff and the members of the Classes are entitled to restitution;

(j) Whether Plaintiff and the members of the Classes are entitled to injunctive relief to enjoin Defendant from further engaging in these wrongful practices; and

(k) Whether Plaintiff and the members of the Classes are entitled to attorney's fees and costs.

36.    *Typicality:* The claims of the name Plaintiff are typical of the claims of other members of the Classes in that the name Plaintiff was exposed to Defendant's false and misleading marketing, purchased Defendant's defective Lidocaine Patches, and suffered a loss as a result of those purchases.

37.    *Adequacy*: Plaintiff will fairly and adequately represent and protect the interests of the Classes as required by Federal Rule of Civil Procedure Rule 23(a)(4). Plaintiff is an adequate representative of the Classes because he has no interests which are adverse to the interests of the members of the Classes. Plaintiff is committed to the vigorous prosecution of this action and, to that end, Plaintiff has retained skilled and experienced counsel, and by providing a cure-notice to Defendant regarding the Lidocaine Patches' defects on behalf of the members of the Classes to protect their interests.

38.    *Superiority:* A class action is superior to all other available methods of the fair and efficient adjudication of the claims asserted in this action under Federal Rule of Civil Procedure 23(b)(3) because:

(a) The expense and burden of individual litigation makes it economically unfeasible for

members of the Classes to seek to redress their claims other than through the procedure of a class action;

(b) If separate actions were brought by individual members of the Classes, the resulting duplicity of lawsuits would cause members of the Classes to seek to redress their claims other than through the procedure of a class action; and

(c) Absent a class action, Defendant likely will retain the benefits of its wrongdoing, and there would be a failure of justice.

## CAUSES OF ACTION

### COUNT I
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-313**
**(On Behalf of Plaintiff and the New York Subclass)**

39.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

40.    Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

41.    Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

42.    Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

43.    15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

44.    N.Y. U.C.C. § 2-313 provides a cause of action to buyers when sellers breach express warranties.

45.     On the Lidocaine Patches' packaging, Defendant expressly warranted that Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

46.     Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant expressly warranted that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

47.     Those statements became the basis of the bargains for Plaintiff and the New York Subclass members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

48.     Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

49.     In so doing, Defendant breached N.Y. U.C.C. § 2-313.

50.     As a direct and proximate result of Defendant's breach of its express written warranties, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

## COUNT II
### Violation of New York's Warranty Act, N.Y. U.C.C. § 2-314
### (On Behalf of Plaintiff and the New York Subclass)

51.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

52.    Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

53.    Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

54.    Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

55.    15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

56.    N.Y. U.C.C. § 2-314(1) creates an implied warranty of merchantability when a seller "is a merchant with respect to goods of that kind."

57.    Defendant is a merchant as defined in 15 N.Y. U.C.C. § 2-104(1) because it deals in goods in the kind (i.e., selling Lidocaine Patches) and holds itself out as having knowledge or skill peculiar to the practices or goods involved (i.e., selling pharmaceutical goods).

58.     For goods to be merchantable, they must be "fit for the ordinary purposes for which such goods are used." N.Y. U.C.C. § 2-314(2)(c).

59.    Defendant breached its implied warranties of merchantability by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

60.    In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(c).

61.    For goods to be merchantable, they must also "conform to the promises or affirmations of fact made on the container or label if any." N.Y. U.C.C. §§ 2-314(2)(f).

62.    On the Lidocaine Patches' packaging, Defendant promised and otherwise made affirmations of fact that the Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

63.    Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant promised and otherwise made affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other available over-the-counter and/or prescription-strength lidocaine patches.

64.    Defendant's Lidocaine Patches did not conform to those promises and affirmations of fact because they: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

65.    In so doing, Defendant breached N.Y. U.C.C. § 2-314(2)(f).

66.    As a direct and proximate result of Defendant's breach of its implied warranties of merchantability, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

<u>COUNT III</u>
**Violation of New York's Warranty Act, N.Y. U.C.C. § 2-315
(On Behalf of Plaintiff and the New York Subclass)**

67.    Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

68.    Defendant's Lidocaine Patches are goods as defined in N.Y. U.C.C. § 2-105(1).

69.    Plaintiff and the New York Subclass members are buyers as defined in N.Y. U.C.C. § 2-103(1)(a).

70.    Defendant is a seller as defined in 15 N.Y. U.C.C. § 2-103(1)(d).

71.    15 N.Y. U.C.C. § 2-607 is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

72.    N.Y. U.C.C. § 2-315 provides a cause of action when "the seller at the time of contracting has reason to know any particular purpose for which the goods are required and that the buyer is relying on the seller's skill or judgment to select or furnish suitable goods."

73.    Defendant knew that the Lidocaine Patches that it sold to Plaintiff and the New York Subclass members were designed for the specific purpose of providing analgesic effects to sore muscles.

74.    Lacking the requisite pharmacological knowledge to evaluate the efficacy of the Lidocaine Patches, Plaintiff and the New York Subclass members relied on Defendant's skill and judgment as a reputable pharmaceutical company when they chose to buy the Lidocaine Patches.

75.    Defendant breached its implied warranties of fitness for use by selling to Plaintiff and the New York Subclass members Lidocaine Patches which systematically peeled off their bodies well before they ought to be fit as an analgesic for sore muscles.

76.     In so doing, Defendant breached N.Y. U.C.C. § 2-315.

77.     As a direct and proximate result of Defendant's breach of its implied warranties of fitness for use, Plaintiff and the New York Subclass members have been damaged in an amount to be proven at trial.

<u>COUNT IV</u>
**Violation Of The Magnuson-Moss Warranty Act, 15 U.S.C. § 2301, *et seq.***
**(On Behalf of Plaintiff and the Class)**

78.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

79.     15 U.S.C. § 2310(d) is satisfied because Plaintiff properly invokes jurisdiction under the Class Action Fairness Act ("CAFA").

80.     15 U.S.C. § 2310(e) is satisfied because Plaintiff provided Defendant a reasonable opportunity to cure the defects contained in the Lidocaine Patches by sending Defendant a cure notice outlining those defects in full via certified mail on October 20, 2021.

81.     15 U.S.C. § 2310(d)(1) provides a cause of action to "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation… under a written warranty, implied warranty, or service contract."

82.     Defendant's Lidocaine Patches are consumer products as defined in 15 U.S.C. § 2301(1).

83.     Plaintiff and the Class members are consumers as defined in 15 U.S.C. § 2301(3).

84.     Defendant is a supplier and warrantor as defined in 15 U.S.C. §§ 2301(4) and (5).

85.     15 U.S.C. § 2301(6)(A) defines "written warranty" as "any written affirmation of fact or written promise made in connection with the sale of a consumer product by a supplier to a buyer which relates to the nature of the material or workmanship and affirms or promises that

such material or workmanship…will meet a specified level of performance over a specified period of time."

86.    Defendant provided Plaintiff and the Class members "written warranties" within the meaning of 15 U.S.C. § 2301(6) by providing written promises and affirmations of fact on the Lidocaine Patches' packaging that the Lidocaine Patches are "Stay-put flexible" patches capable of providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours."

87.    Furthermore, on the Maximum Strength Lidocaine Patches packaging, Defendant provided written promises and affirmations of fact that those Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches.

88.    Those statements became the basis of the bargains for Plaintiff and the Class members because they are factual statements that a reasonable consumer would consider material when purchasing a lidocaine patch.

89.    Defendant breached these express warranties by delivering Lidocaine Patches that: (1) systemically fail to adhere to its consumers' bodies up to 12 hours; (2) are insufficiently flexible to withstand regular activities (such as walking, stretching, and sleeping); (3) fail to continuously relieve pain by providing a 4% lidocaine dose throughout the specified amount of time represented therein due to their partial or complete detachment; (4) do not provide the maximum amount of lidocaine available in patch form; and (5) are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

90.    Further, Defendant breached its implied warranties of merchantability and fitness for use due to its breaches of N.Y. U.C.C. §§ 2-314, 15, as set forth above. 15 U.S.C. § 2301(7).

91.     As a direct and proximate result of Defendant's breach of its express and implied

warranties, Plaintiff and the Class members have been damaged in an amount to be proven at

trial.

**COUNT V**
**Violation of New York G.B.L. § 349**
**(On Behalf of Plaintiff and the New York Subclass)**

92.     Plaintiff incorporates by reference each of the allegations contained in the

foregoing paragraphs of this Complaint as though fully set forth herein.

93.     New York's General Business Law § 349 prohibits deceptive acts or practices in

the conduct of any business, trade, or commerce.

94.     In its sale of Lidocaine Patches throughout the State of New York, at all relevant

times herein, Defendant conducted business and trade within the meaning and intendment of

New York's General Business Law § 349.

95.     Plaintiff and the New York Subclass members are consumers who purchased the

Lidocaine Patches from Defendant for their personal use.

96.     By the acts and conduct alleged herein, Defendant engaged in deceptive, unfair,

and misleading acts and practices, which include, without limitation, (i) misrepresenting the

efficacy of the Lidocaine Patches on their packaging (i.e., that they are "Stay-put flexible"

patches capable of providing pain relief by delivering a 4% lidocaine for "up to 12 hours,"

despite their systematic failure to do so); (ii) omitting that the Lidocaine Patches are prone to

even greater detachment when consumers engage in certain activities: such as walking,

stretching, or sleeping; and (iii) misrepresenting that the Maximum Strength Lidocaine Patches

provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or

prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches

do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

97.     The foregoing deceptive acts and practices were directed at consumers.

98.     The foregoing deceptive acts and practices are misleading in a material way because they fundamentally misrepresent the intrinsic qualities of the Lidocaine Patches.

99.     As a result of Defendant's deceptive practices, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

100.     On behalf of himself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or fifty dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

<u>COUNT VI</u>
**Violation of New York G.B.L. §350**
**(On Behalf of Plaintiff and the New York Subclass)**

101.     Plaintiff incorporates by reference each of the allegations contained in the foregoing paragraphs of this Complaint as though fully set forth herein.

102.     New York's General Business Law § 350 prohibits false advertising in the conduct of any business, trade, or commerce.

103.     Defendant violated New York General Business Law § 350 by falsely advertising on the Lidocaine Patches' packaging that they are "Stay-put flexible" patches capable of

providing pain relief by delivering a 4% lidocaine dose for "up to 12 hours," when, in fact, they systematically fail to do so.

104.    Furthermore, Defendant violated New York General Business Law § 350 by omitting that the Lidocaine Patches are prone to even greater detachment when consumers engage in certain activities: such as walking, stretching, or sleeping.

105.    Finally, Defendant violated New York General Business Law § 350 by misrepresenting that the Maximum Strength Lidocaine Patches provide a "Maximum Strength" dose of lidocaine in comparison to other over-the-counter and/or prescription-strength lidocaine patches when, in fact, the Maximum Strength Lidocaine Patches do not provide the maximum amount of lidocaine available in patch form and are not superior, or at least equivalent, in efficacy and results to other over-the-counter and/or prescription-strength lidocaine patches.

106.    The foregoing advertising was directed at consumers and was likely to mislead a reasonable consumer acting reasonably under the circumstances.

107.    Defendant's misrepresentations and omissions have resulted in consumer injury or harm to the public interest.

108.    As a result of Defendant's false advertising, Plaintiff and the New York Subclass members suffered an economic injury because (a) they would not have purchased the Lidocaine Patches had they known the veracity of Defendant's misrepresentations and omissions, and (b) they overpaid for the Lidocaine Patches on account of such misrepresentations and omissions.

109.    On behalf of himself and the New York Subclass members, Plaintiff seeks to enjoin the unlawful acts and practices described herein, to recover their actual damages or five hundred dollars, whichever is greater, three times actual damages, and reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)     For an order certifying the Classes under Rule 23 of the Federal Rules of Civil Procedure; naming Plaintiff as representative of the Classes; and naming Plaintiff's attorney as Class Counsel to represent the Classes;

(b)     For an order finding in favor of Plaintiff and the Classes on all counts asserted herein;

(c)     For compensatory and punitive damages in amounts to be determined by the Court and/or jury;

(d)     For prejudgment interest on all amounts awarded;

(e)     For an order of restitution and all other forms of equitable monetary relief;

(f)     For injunctive relief as pleaded or as the Court may deem proper; and

(g)     For an order awarding Plaintiff and the Classes their reasonable attorneys' fees and expenses and costs of suit.

## DEMAND FOR TRIAL BY JURY

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of any and all issues in this action so triable as of right.

Dated: December 11, 2021                Respectfully submitted,

                                        **GUCOVSCHI ROZENSHTEYN, PLLC**

                                        By:    _/s/ Adrian Gucovschi_
                                               Adrian Gucovschi

                                        Adrian Gucovschi
                                        630 Fifth Avenue, Suite 2000
                                        New York, NY 10111

Telephone: (212) 884-4230
E-Mail: adrian@gr-firm.com

*Attorney for Plaintiff*